**ANTHONY TURBE and LOLA TURBE, Plaintiffs**

**v.**

**ROBERT A. LYNCH TRUCKING, INC. d/b/a**
**BOB LYNCH TRUCKING & SHIPPING, Defendant**

Civ. No. 293/1995

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

October 7, 1999

DESMOND L. MAYNARD, ESQ., St. Thomas, U.S.V.I., *for Plaintiffs*

MARIA TANKENSON HODGE, ESQ., St. Thomas, U.S.V.I., *for Defendant*

HOLLAR, *Judge*

## MEMORANDUM OPINION

THIS MATTER is before the Court on defendant's motion *in limine* for exclusion of testimony. The plaintiffs vehemently oppose defendant's motion. For the reasons that follow, defendant's motion is granted.

## I. FACTS AND PROCEDURAL POSTURE

Plaintiff, Anthony Turbe, was employed by Kresto Dania, (hereinafter "Kresto'"), a wholesaler of food products and beverages. As an employee, Turbe was responsible for unloading merchandise when delivered to the warehouse. Defendant Bob Lynch Trucking, Inc., (hereinafter "Lynch Trucking"), was hired by Kresto to deliver trailers of merchandise to the warehouse. Turbe was working alone at the warehouse on April 4, 1994 when a Bob Lynch truck made a delivery. In the process of assisting the driver in positioning the trailer to unload, Turbe sustained injuries to his left foot, ankle and shoulder when he fell off the receiving platform while trying to hold a stack of bottled beverages in place, located in the back of the opened trailer. Turbe lost his balance and fell because the truck suddenly jerked forward after its wheel(s) apparently slipped off a wooden pallet. Unaware that Turbe had slipped off the platform onto the ground, the driver resumed reversing toward the receiving platform, totally, oblivious to Turbe's desperate plea for him to "go forward". As a result of his injuries, Turbe was taken to the emergency room at Roy L. Schneider Hospital, admitted, and was subsequently released four (4) days later.

During his convalescence, Turbe suffered a minor heart attack while at Magens Bay on May 6, 1994. Following his heart attack, Turbe returned to Roy L. Schneider Hospital, however, he was later sent to Puerto Rico. In Puerto Rico, Dr. Betancourt, an interventional cardiologist with extensive clinical and diagnostic experience, examined Turbe on May 20, 1994. Although a critical aspect of the examination was the recordation and analysis of Turbe's complete medical history, Turbe neglected to mention to Dr. Betancourt his hospitalization the previous month following the accident at his work place. Based on the medical history given, tests and a physical examination, Dr. Betancourt diagnosed plaintiff as having coronary artery disease caused by a "congenital,

hereditary condition", and having sustained an acute myocardial infarction. On May 26, 1994, Dr. Betancourt successfully performed an angioplasty to open Turbe's totally occluded left artery. While Dr. Betancourt concluded that Turbe had sustained a heart attack, it was his opinion that minimal damage to the heart had resulted.

The year following the job related accident, on April 12, 1995, plaintiff Anthony Turbe filed a complaint against defendant Lynch Trucking seeking to recover compensatory and other damages for bodily injuries sustained as a result of defendant's negligence. Co-plaintiff Lola Turbe, Anthony Turbe's wife, also sought compensatory damages derivatively against the defendant for loss of consortium.

In preparation for trial, Dr. Betancourt was deposed on April 8, 1998. During his deposition, when asked whether it was his opinion that the job related accident in April 1990 (sic) [1] *could have contributed* [to plaintiff's heart attack], Dr. Betancourt responded, "yes". Immediately thereafter, however, when asked if it was his opinion "within a reasonable degree of medical certainty" that the accident at work triggered plaintiff's heart attack, Dr. Betancourt replied, "No, the first option."

Following the deposition, on July 21, 1998, defendant filed a motion *in limine* requesting this Court to exclude both testimony and reference by counsel and witnesses, to the heart attack suffered by plaintiff, because Dr. Betancourt, in his deposition, could not state, "within a reasonable degree of medical certainty," that the job-related accident suffered by plaintiff triggered his heart attack, and admissibility in this jurisdiction requires the testimony by the expert be offered "within a reasonable degree of medical certainty".

Shortly after the defendant filed its motion, Dr. Betancourt capitulated from the position he took in his earlier deposition and, on August 14, 1998, Dr. Betancourt filed an affidavit confirming his current opinion, "within a reasonable degree of medical certainty," that the stress suffered from the job related accident was a direct and substantial contributing catalyst triggering Turbe's heart attack. Dr. Betancourt also affirmed that this opinion was based on

---

[1] April 1994.

an assessment of the condition of Mr. Turbe's cardiovascular system when he examined him. According to Dr. Betancourt's superseding opinion, the stress imposed by the accident of April 4, 1994, precipitated a marked increase in oxygen demanded by the heart, and as a result of the almost-total occlusion of Mr. Turbe's arteries, oxygen could not get to the heart as needed, thus causing the heart attack.

On August 21, 1998, plaintiffs filed a response in opposition to defendant's motion *in limine*. Plaintiffs' response averred, *inter alia*, that after considering psychiatric/psychological evaluations which diagnosed Anthony Turbe as having suffered from "post traumatic stress disorder" following the accident, and before suffering the heart attack on May 6, 1994, Dr. Betancourt was now of the opinion "within a reasonable degree of medical certainty," that there was a causal connection between Turbe's accident and his subsequent heart attack.

On August 28, 1998, defendant filed its reply to plaintiffs' response, in which it contended that the Court should disregard Dr. Betancourt's affidavit on the grounds that it contradicted his former testimony at the deposition, and plaintiff provided no basis for the alleged contradiction.

On September 11, 1998, in another affidavit, Dr. Betancourt affirmed, *inter alia*, that his opinion regarding the occurrence of Mr. Turbe's heart attack (hereinafter his "post-deposition" opinion) was formed because of his having been apprised, subsequent to his deposition on April 8, 1998, of several psychological/psychiatric evaluations of Mr. Turbe which indicated that Mr. Turbe experienced severe and ongoing stress as a direct result of the accident.

On September 18, 1998, plaintiffs filed their supplemental response in opposition to defendant's reply to plaintiffs' opposition to motion *in limine* for exclusion of testimony.

## II. DISCUSSION

In order to rule on defendant's motion, the following issues must be resolved: (a) whether Dr. Betancourt qualifies, as an expert witness; (b) whether Dr. Betancourt's initial deposition testimony is admissible; (c) whether Dr. Betancourt's post deposition affidavit dated August 14, 1998 should be allowed to supplement his

149

deposition testimony; and (d) whether Dr. Betancourt's depositional testimony, when supplemented by his affidavit dated August 14, 1998, is admissible.

## A. Dr. Betancourt Qualifies As An Expert Witness

In addressing whether Dr. Betancourt is qualified to testify as an expert witness, F.R.E. 702, must be applied. That rule provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

In *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), the U.S. Supreme Court interpreted this Rule as having three major requirements: (1) the witness must be an expert; (2) the procedures and methods used in forming an opinion must be reliable; and (3) the testimony must "fit" the factual dispute at issue so that it will assist the trier of fact. *Id.* at 591; *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985).

Admissibility under *F.R.E.* 702 is inextricably intertwined with *F.R.E.* 104(a), which requires the judge to determine preliminary questions concerning the admissibility of evidence by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid", thus enabling the judge to exclude evidence presented in plaintiff's prima facie case. *Daubert, supra,* at 592-93.

■ In our case under consideration, Dr. Betancourt is a licensed cardiologist, presumed to be knowledgeable in diagnosing ailments of the heart. The record further reflects that Dr. Betancourt has had extensive training and experience in treating and diagnosing disease of the heart. An expert is competent to express an opinion if he has a "reasonable pretension to the specialized knowledge on the subject under investigation." *Arnold v. Loose*, 352 F.2d 959, 962 (3d Cir. 1965) (quoting *Demarco v. Frommyer Brick Co.*, 203 486 Pa. Super (1964)). He must show at least a general familiarity with the field or that he has had some opportunity or means of acquiring special knowledge or experience with reference

150

to the particular question. *Id.* (quoting 1 HENRY, PENNSYLVANIA EVIDENCE, § 563). After considering the record, the Court concludes that Dr. Betancourt, through his deposition testimony, has shown substantial familiarity within the field of cardiology. Accordingly, the Court finds that the first prong of the *DAUBERT/F.R.E.*[2] 702 requirement has been satisfied.

### B. Dr. Betancourt's Deposition Testimony As To The Cause Of Turbe's Heart Attack Is Inadmissible

■ The plaintiffs in a negligence cause of action bear the burden of proving, *inter alia*, that the defendant's acts were the proximate cause of the injury complained of. In the instant case, the plaintiff seeks to prove the element of causation by means of expert testimony. When a party must prove causation through expert testimony, the expert must testify with reasonable certainty that in his professional opinion the result in question did come from the cause alleged. *Cohen v. Albert Einstein Medical Center*, 405 Pa. Super. 392 (1991), *appeal denied*, 529 Pa. 644 (1992)(quoting *Kravinsky v. Glover*, 263 Pa. Super 8, (1979)). The United States Third Circuit Court of Appeals has subsequently held that medical expert witnesses are required to testify with a reasonable degree of medical certainty. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 751 (3d Cir. 1994). This does not mean that when medical experts give their opinion they recite the talismanic phrase that their opinion is given within "a reasonable degree of medical certainty",[3] but the testimony should be unequivocal,[4] rather than speculative.[5]

■ Having applied the standard applicable in this jurisdiction, Dr. Betancourt's initial depositional expert testimony regarding the cause of Turbe's heart attack would be inadmissible because he could not state, in unequivocal terms, what caused Turbe's heart attack.

---

[2] Federal Rules of Evidence.

[3] *Schultz v. Celotex Corp.*, 942 F.2d 204, 208 (3d Cir. 1991).

[4] *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777 (3d Cir. 1996).

[5] *Schultz, supra*, at 208.

## C. Dr. Betancourt Is Not Precluded From Amending His Earlier Deposition Testimony By Affidavit Even If By Doing So, The Later Contradicts The Former Testimony

After declining to state during a deposition that, to a reasonable degree of medical certainty, he was of the opinion that the accident which occurred at Mr. Turbe's work place caused his heart attack, Dr. Betancourt thereafter sought to amend his testimony by affidavit. In the affidavit, Dr. Betancourt changed his opinion to assert that it was now his opinion, within a reasonable degree of medical certainty, that the job related accident did indeed trigger Mr. Turbe's heart attack.

Dr. Betancourt then filed yet another affidavit in which he contended, *inter alia*, that his newly formed opinion as to the cause of Mr. Turbe's heart attack was a result of his having been apprised, subsequent to his deposition, of several psychiatric/psychological evaluations which had been made of Mr. Turbe, which indicated that Mr. Turbe had experienced severe and ongoing stress as a direct result of the accident at his job.

In opposing Dr. Betancourt's attempt to amend his deposition testimony, defendant argues that while it had not found any case law explicitly addressing the situation of excluding deposition testimony, by motion *in limine*, where a contradictory subsequent affidavit is submitted, the court should be guided by an extended body of case law on a "closely analogous point." This "extended body of case law" is comprised of cases, each involving pending summary judgment motions, where there exists a deposition which by itself would not create a genuine issue of material fact, and in which the Court excluded from consideration contradictory testimony contained in a subsequent affidavit.[6]

Citing additionally, *Joseph v. Hess Oil*, 867 F.2d 179 (3rd Cir. 1989); *Foster v. Arcata Assoc.*, 772 F.2d 1453 (9th Cir. 1985); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir. 1975); and *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2nd Cir. 1969), defendant contends that the Court should apply the law as held by the cases offered to the case at bar, since the objections are analogous.

---

[6] *See, e.g.*, Radobenko v. Automated Equip. Corp., 520 F.2d 540 (9th Cir. 1975).

Plaintiff, however, contends that the cases relied upon by defendant are distinguishable from the case *sub judice* in that the cases cited by defendant only apply where the deposition and subsequent contradictory affidavit have been made by a party, whereas the testimony at issue in this case is that of a *disinterested witness*. Plaintiffs' position is not without support. In *Lane v. Celotex Corp.*, 782 F.2d 1526, 1531 (11th Cir. 1986)(dicta), the Court of Appeals for the Eleventh Circuit, in reversing the district court's grant of summary judgment, held that the district court improperly disregarded the affidavit of the plaintiffs' co-worker on the basis that the affidavit directly contradicted the co-worker's earlier deposition testimony. The opinion of the Court stated:

> "While a district court may find that a party's contradictory affidavit constitutes a sham, *e.g., Van T. Junkins*, 736 F.2d at 656, we would be unable, absent great trepidation, to affirm a similar finding with respect to a disinterested witness' contradictory affidavit."

█ In light of the liberal tenor of Lane, supra, the Court finds Dr. Betancourt to be a non-party disinterested expert witness. Hence, this Court will consider the subsequent affidavit testimony of Dr. Betancourt, albeit contradictory to his prior disposition testimony.

## D. Dr. Betancourt's Deposition Testimony Even When Supplemented By His August 14, 1998 Affidavit Is Inadmissible

As stated previously, *F.R.E.* 702 and 104(a) govern the admissibility of expert testimony. Rule 702 provided that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Thus, rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or special knowledge; and (3) the expert's testimony must assist the trier of fact to understand or determine a fact in issue.[7] Rule 104(a) requires the

---

[7] *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-42 (3d Cir. 1994).

judge to conduct preliminary fact finding, to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, and of whether that reasoning or methodology can properly be applied to the facts in issue."[8] Thus, under the *Federal Rules of Evidence*, the trial judge is required to act as a "gatekeeper" to ensure that any and all expert testimony or evidence is not only relevant, but also reliable.[9]

In order for expert testimony to be reliable, the testimony must be based on "methods and procedures of science," rather than on "subjective belief or unsupported speculation."[10] The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle is sufficiently reliable so that it will assist the jury in reaching accurate results".[11]

Generally, in determining whether a particular scientific methodology is reliable, several factors ought to be considered. These include: (1) the testability of the expert's hypothesis; (2) whether the methodology has been subjected to peer review and publication; (3) the frequency by which the methodology leads to erroneous results; and (4) whether the methodology is generally accepted in the scientific community.[12] These factors should not, however, obscure the fact that the court's gatekeeper role is a flexible one. The factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.[13]

The scientific methodology employed by physicians, specifically, when determining the cause of an illness or medical condition is referred to as a "differential diagnosis". The basic method utilized in internal medicine[14] is differential diagnosis, which involves

---

[8] *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 591, 592-93 113 S.Ct. 2786, 2796 (1993).

[9] *Terminix Int'l, Inc. v. Kannankeril*, 128 F.3d 802, 806 (3d Cir. 1997)(citing Daubert v. Merril Dow Pharmaceutical, Inc. 509 U.S. 579, 589, 113 S.Ct. 2786, 2794-95, (1993).

[10] *In re Paoli, supra*, at p. 744.

[11] *DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990) (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence*, 702[03], at 702-35 (1988)).

[12] *See, Daubert, supra*, at 593-94 (1993).

[13] *Id.* at 594, n. 12.

[14] *Paoli*, 35 F.3d at 755.

assessing causation with respect to a particular individual.[15] Performing physical examinations, taking medical histories, and utilizing laboratory tests all provide significant evidence of a reliable differential diagnosis.[16] At the core of a differential diagnosis, however, is a requirement that experts rule out obvious alternative causes.[17]

Applying that standard, Dr. Betancourt during his initial deposition was asked about the type of "triggering events" that could cause a person with occluded arteries, such as Mr. Turbe, to experience a heart attack.[18] Premising the onset of a heart attack on the sudden unsatisfied demand by the heart for oxygen, Dr. Betancourt cited several scenarios, including: (1) running,[19] (2) walking quickly to the front door to answer the bell,[20] (3) the presence of a child having problems with drugs,[21] and (4) heavy drinking.[22] To the extent that he conceded that any one of the identified scenarios could trigger a heart attack in a person having occluded arteries such as Mr. Turbe's, Dr. Betancourt expressed an awareness of obvious alternative causes which, under *Heller, supra*, must be ruled out. Dr. Betancourt did not investigate any other possible causes. His very admission establishes this fact.[23] Because he failed to address this most important requirement for making a reliable differential diagnosis, the methodology employed by Dr. Betancourt in forming an opinion as to the cause of Turbe's heart attack is suspect and inherently unreliable, making any opinion so premised unreliable as well.

---

[15] *Id.* at 758.

[16] *Paoli*, 35, F.3d at 13.

[17] *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 156 (3d Cir. 1999).

[18] Deposition of Dr. Betancourt, p. 27.

[19] Deposition of Dr. Betancourt, p. 25.

[20] Deposition of Dr. Betancourt, p. 28.

[21] Deposition of Dr. Betancourt, p. 33.

[22] Deposition of Dr. Betancourt, p. 33.

[23] In his deposition Dr. Betancourt was asked the following question and gave the following response, *inter alia*:
Q. Have you explored with Mr. Turbe whether there were other things going on in his life at the same time that were also stressful to him?
A. I didn't get into those details because that is not my job ...

■ Further, the reliability analysis applies to all aspects of an expert's testimony: the methodology, *the facts underlying the expert's opinion,* the link between the facts and conclusion, *et seq. Paoli, supra,* at 743-45. Dr. Betancourt also asserted in his September 11, 1998 affidavit, that he relied on psychiatric and psychological evaluations[24] in reaching his opinion, within a reasonable degree of medical certainty, that stress, created as a result of Mr. Turbe's job related accident, triggered his heart attack. He also stated that the evaluations he relied upon diagnosed Mr. Turbe as suffering from "Acute Post Traumatic Stress Disorder" during the period immediately following the accident, but before the myocardial infarction occurred. Hence that disorder was "directly related to the accident." A review of the evaluations in question, however, disclosed that the emphasized portion of this testimony is unsupported. While the evaluations do address the fact that Mr. Turbe was exhibiting symptoms of stress, with one specifically diagnosing Acute Post Traumatic Stress Disorder, only one evaluation, that of Dr. Jose E. Villanvera, addresses or even refers to the heart attack. Most importantly, Dr. Villanvera, in his summary and conclusions stated: "The heart condition that developed *is unrelated to the accident.*" Clearly, Dr. Betancourt's sworn post-deposition opinion, relying on the very evaluations that are either silent on the issue of causation or negate any such causation is, at best, disingenuous.

## III. CONCLUSION

A medical expert's opinion on causation should only be admitted if it "has a factual basis and supporting scientific theory that is reliable."[25] The Court finds that Dr. Betancourt's superseding testimony regarding the cause of Mr. Turbe's heart attack is inadmissible because: (1) the methodology employed by him in determining causation is fatally flawed thus rendering the diagnosis inherently unreliable and untrustworthy; (2) some facts under-

---

[24] Psychiatric evaluations were performed by Dr. Jose E. Villanvera and Kathleen Smith, M.A. respectively. A psychological evaluation was also performed by Dr. Chester Copeman, Ph.D.

[25] *Heller, supra,* at 157 quoting *Kannankeril v. Terminix Int'l, Inc.,* 128 F.2d 802, 808 (3d Cir. 1997).

lying his opinion, specifically that he relied on psychiatric evaluations which stated that Mr. Turbe was suffering from Post Traumatic Stress Disorder, and that this disorder was *directly related* to the accident, are unsupported; and (3) given its inherent unreliability, the expert testimony cannot aid the jury/finder of fact in understanding or determining disputed facts. Accordingly, Dr. Betancourt's testimony bearing on the cause of Mr. Turbe's heart attack must be excluded pursuant to F.R.E. 104(1) and 702.

DATED: October 7, 1998